Our second case of the morning is N. Ray, the Marriage of Company in Kimber, and we are joined today for the appellant, Mr. Shearing, and for the appellee, Mr. Woodward. You may proceed. This is a field that has been filed by Dr. Kimber, the respondent in the Dissolution Act, and I'm going to volunteer. The issues that we're asking the court to consider are threefold. Number one, whether or not the court should have imputed income to Carolyn Mound Company. And number two, should the court have deviated from the setting of the child support, pursuant to statute, or deviated upward, and whether or not any reduction in the child support should be retroactive. So those are the three issues that bring us before the court today. The parties in this case were married in 1995, and there was a dissolution entered on November 4, 2014. At that time, Dr. Kimber was ordered to pay child support of some $6,000. The parties had four children. It's important to look back to the case that Ms. Company, that's now her name, now waived maintenance at that time, indicating that she felt she was being self-sufficient. There was no maintenance that was ordered against her. And, counsel, your client was also ordered to pay a certain percentage of any bonuses he received as well. Is that correct? Yes, pursuant to statute, he was ordered to pay $6,000 plus 40% of any of his bonuses. That was subsequently reduced after the old Ms. Chown, in fact, married, and he was ordered to pay $5,275 plus, at that time, 32%. So the statute was followed. And his bonuses varied. So as far as the grounds of the filing of the motion, both parties have agreed that the residence of Ms. Chown has changed in certain senses, in that the second oldest child had graduated high school and had reached the age of 18. So there had been a petition filed on July 17, 2018. The plain petition, in this case, Ms. Company, shortly after the dissolution, moved to Bloomington, Illinois, where she took up residency with her future husband. In fact, they were married shortly after that. And I think why that's important is that since the judgment was ordered back in 2014, Ms. Company did not have any full-time employment other than this company that she was working to develop called Wellness Data Solutions. The evidence at the hearing was that her income was $2,000 a year, and the court calculated the income per month of $208 per month for her, and $45,323 for Dr. Kimberley. We believe that the income should have been computed to her. Also, the $45,000 was, in fact, the income that he made in the prior year, which was over $500,000. When we did the calculation, we went to the last five years, and there was an increase in his income because of, and the testimony was that his money was owed by the state of Illinois. It was fake money. He had a nurse practitioner working for him that year where he earned money from her that was no longer with him. So that's why there was a tweak or an increase in his income for that year. So we have averaged the income over the years and came up with an amount, and we believe that's what the amount should be in regards to the child support. The party's daughter, Madeline, was the one that reached the age of 18, graduated, and enrolled in school at Illinois State. She continues to reside with her mother, and in the budget that was prepared, the only reason I'm addressing that, because I think that's important in regards to the need of the children, the two older, the younger children now, that she submitted a budget and she doesn't have three children that's residing with her. There wasn't a petition filed for college expenses. In fact, Madeline has, as all the children did, some $82,000 in the form to pay for that. Ms. Company has elected to use the money that she receives from child support to pay for the expenses for Madeline to attend college. The last year, prior to the filing of the petition, Dr. Kimber contributed $99,000 in child support. Now, out of that money, she paid for the expenses for the kids, she paid for the expenses for herself, she paid for the expenses for her Mr. Company, who earned only $5,000 that year, she paid for the business that was failing, and she made no money off of it in the last four years. So the child support was not used to support strictly the children. It was used to support the entire family. It's also important in regards to the children. Dr. Kimber had the children originally. There's a parenting plan that's attached to the judgment. He had the children during the week, but then when they moved, his parenting time was limited. But he still had the children five weeks in the summer, every other weekend, the holidays, a week over Christmas, a week over spring break. So he had the children about a third of the time overnight. Not the 147 days, but he had the children overnight. So that was about a third of the time that he spent with the children, and had them in his custody and paid for what the expenses were for the children with him. Counsel, can we back up a minute? What amount are you suggesting the trial court should have imputed to Ms. Company? $5,800 a month. I base that on two things. Ms. Company is an educated person, number one. And if you read her testimony, she seems to be very industrious. She's trying to get this business going, but it's failed for four years. Sometimes you get it going in town, I'll say, and maybe it'll be something else. In 2011, she was working at the Quincy Medical Group, I believe. Ten months, and she was earning $5,800 there. When she got to Bloomington, the house that they purchased, she paid for, except Mr. Company paid $50,000 to buy that. But in her application, she also indicated an income of $5,800 per month. So I think that is a fair starting point to look at in computing income. Now, what about there was testimony that jobs that would pay the equivalent of what she made in Quincy, that they were not available and that she would only be eligible for entry-level positions. If I'm recalling correctly, making $30,000 or $40,000 a year. Yeah, she did it. She indicated that. There was no FNS submitted as to whether or not any of those positions are available now. She indicated that if she went back to work, she would be in that range. That's her opinion. She's not booked for a job. Let me ask you a question. Was she worth $5,800 working with the doctor or working with that practice? She worked for the Quincy Medical Group. She had a position there that... Well, I don't... That I can't answer. You can't answer, but when the spouse of one of the physicians, particularly if it's a physician that appears to be successful, applies for a job, they probably are going to get it, assuming they're qualified. And they may make more there than they would make in the ordinary work world. Right. But definitely your position is you've got to impute some income to her at some amount. The woman is qualifying to work. I mean, she has a master's or BA degree. I mean, she's educated. She's working in this business now that hasn't gone anywhere. She has worked. One of the points the court, Judge Hamps brought up, was that the court wasn't going to impute the income because of this agreement that they had that she would go back to work. Well, they agreed. They had that agreement. She'd get paid $4,000 if she stayed home with the kids. But I don't think that agreement is grounds, according to law, to not impute income. You know, things change. They get divorced. So the children now at home are 17 and 15. You know, she doesn't even stay at home and take care of the kids. And ultimately, your position is that she's really not a stay-at-home mom anymore because of her work with this business. Absolutely. And I think she even testified to that. I mean, she testified to that. She's working very hard to make this business successful, because she knows full well that in three years, jobs weren't going to end. So she's not a stay-at-home mom that doesn't work. She's there. She works. She testified that she's gone one month, or one period of time out of the month, to travel with her and her husband, you know, She even said, and it's on page 18 of her brief, that she's willing to work if she is forced to do so or her children needs requires. There's two ifs here. So she indicates that she's willing to work, but she has elected not to do that. So the income should be imputed. Some income should be imputed to her. I want to also mention that the court made reference to the surplus. I don't know if this makes a lot of difference. I actually think it does, but I want to call it to the court's attention that Dr. Kimber has an excess of $12,000 after payment of bills and taxes and things of that sort, and also with child support. That's not correct. And I would really call the court's attention to Respondent's Exhibit No. 9, which is the financial affidavit of the Respondent, where it refers to the total income available for a month, which is, let's say, $12,000. But that does not include payment of any child support, nor does it include the payment of any bill cards or any taxes that may have to be paid at the end of the year. In the financial affidavit, over and above the money that is taken from Dr. Kimber's income, he has to pay an additional amount of taxes. In 2017, he paid $15,745. In 2016, he paid $18,243. So the statement that he has a surplus of $12,000 is inaccurate. I also want to point out that in the ruling of the court, she discussed the windfall and made a finding that the petitioner had a windfall in regards to the child support. If you look at, and I think she really overlooked, the fact that now we're dealing with only two children. I think she still mistakenly believes that there were three children because of Madeline still being at home. So if we look at a windfall, back when he was paying the amount, he was paying $5,275, I believe, $5,250, and now he's paying $4,700. If you look at the difference between the amount for three children and two children, in fact, the amount that doctors pay on a regular basis has increased and not decreased, even though, as Mr. Woodward pointed out, it didn't include the bonuses. But still, there is a proportionate layer. Yeah, and we are using all of his bonuses to provide his current child support for some of the new statutes. And it's not just based upon what his $300,000 would be. It's based upon any bonuses, averaging them over the last four years. The other thing I'd like to point out is that in her budget, which is Statutes Exhibit No. 16, she goes through and lists the expenses for the kids. And they come to $2,685. And again, their testament is that is for the three children. So that would give you about $895 per child, or for two children, it would be $1,790. So the Court had talked about the best interests of the children. Your Honors, if she was able to save $30,000 from the time we filed the petition back in July of 2018, still support herself, keep the kids still in the same Bloomington school system, keep either Cameron or Clayton in the activities that he was following, she's been able to do that with less than $30,000 that she was being paid. Now, if she would not use that money to support everybody, kids would have a heck of a stipend sitting around where she would have that available to her to pay any retroactive money. So... Now, Counsel, when you say the $2,600 in expenses for the children, do you arrive at that figure by only considering expenses for the children, the two children who are not of age? Yeah, it is in her, I'm getting that from her, the $2,600. She refers, for example, for Internet, all kids, $210. Cell phone, all kids, $320. So I took that directly from her exhibit number 16. And did that include any expense? I realize she paid for the house, but does that include any expense related to that, the housing? No. Okay. I mean, she has specific expenses. There isn't any mortgage on it. Right, right. The party's borrowed $100,000. For the business. Yeah, for business, and that first was included, and Jim said, no, you can't do that. But the, yeah, there is electric, like for $150,000. But those are expenses. We always argue, well, you're going to take those, divide them by, let's say, four. That gets a little cumbersome now. We cover the same expenses that she had, if the kids were there or not there. But then, you know, she used three kids, but Madeline has $82,000 that, you know, she didn't need this half-bent to. But she's using her as having that expense, so I don't know if that's proper. And I think that is all. Thank you. Thank you. You'll have time on rebuttal. Excuse me? You'll have time on rebuttal. Yes. May it please the Court, Mr. Sheeran, let me try to quickly address some of Mr. Sheeran's arguments in regards to the issues that he is pointing out. First of all, in regards to the budget that he is referring to, that is in regards to the children's budget only. This is not a household budget. So I would ask the Court to consider that. Now, you're talking about the $2,600 figure? Yes. So why would the Court be looking at anything other than the children's budget, because this is child support? Well, if you look at the case law that we have cited in our brief, the law is clear that you should just not look at the needs solely of the children. You should also – the Court can't let, in this case, the father live this affluent lifestyle making $550,000 per year and just look at the needs of the child. We've cited a four-sister case law in our brief to support that proposition. Okay, I understand that, but I want to make sure you're not suggesting that the doctor has any responsibility to take care of Ms. Company or her husband, right? No. You're just talking about the standard of living the children would have had had the marriage not been dissolved. That's correct. Okay. And in regards to the argument that she was able to save $30,000 between the time the petition was filed and the time leading to trial, I believe the evidence was she saved $14,000 in addition to what she had previously saved. Also in those accounts, Dr. Kimber owed my client the sum of $575 per month that he was making payments towards a loan that she had forwarded him for monies that she owed him on a profit settlement. So that's where monies also came in, not just child support. To address the argument that the per-child amount of support increased, I'll show the figures or tell the figures to the court. As indicated, in 2018, Dr. Kimber paid $99,968 in child support for three children. That breaks down to $33,322 per year per child, or $2,746 per month. Currently, when we're talking to two children, what you're aware of is child support allocation of that $2,746 per month, which, if we calculate that out, that comes out to be $2,350 per child. So certainly there was a reduction in the amount per child based upon this reduction that the court ordered. But you don't disagree that the trial court did deviate upward? Oh, no, no, no. We're not disagreeing with that at all. In regards to the argument that the court found that Dr. Kimber had $12,000 in excess of his budget and that the financial affidavit is inaccurate, well, if it is, then that's the fault of Dr. Kimber. The whole purpose in filing an affidavit is to be accurate so the court and the parties involved have accurate information on income and expenses. That shouldn't be at the hands of Ms. Kimber. She had drawn that affidavit. That was Dr. Kimber. So having said that, his own affidavit says that at the end of the month he has $12,000 available surplus income after he pays his expenses. And we are free to point out that includes the child support amount. Though if past practices have been that he's owed taxes to the government at the end of the year, I mean, that's evident too in the record, isn't it? At least for the last couple of years and given his income level, that wouldn't be surprising. Well, that wouldn't be surprising. But I mean, even if it's not mentioned in the affidavit, it's mentioned during the proofs in the case. Yeah. The court would have that information. That's right, yeah. The court would have the information that maybe some of that supplemental income or that disposable income at the end of the month, he needed to put some of that aside to pay taxes. Right. Okay. Okay. And can you go back to that particular affidavit of $12,000? Now Dr. Kimbrough also has to get a $3,600 per month that he's not paying additional child support. So that's on top of the $12,000. Would that be the bonus, the fact that he won't pay bonuses anymore? Plus the amount, monthly child support. The reduction in the expenses. So that's saving him $3,600 per month. Because he went from paying almost $100,000 per year, which the figure now is $57,000 per year. So it's a tremendous reduction in the amount of child support that Dr. Kimbrough received through the court's order. In regards to the argument that income should be imputed against Kimbrough, the court has to make a finding to do that that she is voluntarily underemployed or unemployed. In this particular case, the court did do that. How do we know that? Because the court said that her income per month was at $250. So the court found that she was employed, did not make a finding that she was voluntarily underemployed or unemployed. Should the court have made that finding? No, she's starting her own business. She is working very diligently to try to get this business up and running. And I want to back up a little bit, too, because one of the arguments that was made is that maintenance was waived at the time of the divorce. That's true. There's no argument in that fact. One of the statements and testimony of Ms. Company was part of the reason she waived maintenance. She didn't know that child support bills were going to change. No one did. In 2015, when we did the modification of child support, there was no indication. Well, when we did divorce, there was certainly no indication that the child support bills were going to change. In this particular case, if you look at the current, if it was old law, Dr. Kimber's obligation would be over $8,000 per month. Even with the increase in child support, the court ordered it to $4,700 per month. The new law, in essence, cuts his obligation in half. My client didn't know that when she negotiated. This was not a contested divorce. This was a non-contested divorce. The parties reached an agreement. In fact, you see in the judgment, Dr. Kimber wasn't represented by an attorney of record, but he was represented by an attorney who reviewed the documents and so forth. This was not a contested divorce situation. When she's looking at child support numbers, persons have to make that decision. Do I waive maintenance? Do I go for maintenance? Can I survive? Can the children survive on the amount of child support? She made that decision. Again, she didn't know the child support clause was going to change. We didn't know that. He didn't know that. Nobody knew that. Maybe the legislator knew that, but that was well, well in the past. This divorce occurred back in 2014. I just want to point that out to you. I have a question. Let's suppose that the court views this as he should have imputed income. Would he still have the discretion to deviate upward because he was giving her credit for trying to start or making an effort to have a business that would succeed that would protect her and the remaining child in the future? And I say remaining child, meaning just the younger one because the older one, maybe we're going to be back here in a year and a half. I don't know. But would he be entitled to use his discretion to do that? Would the court have the discretion to deviate upward? After saying, yeah, I probably do need to impute income to you, but even if I impute an entry level position, I'm still going to deviate upward because of the dramatic decrease we're going to see based on the change in the laws and your willingness to waive or to no longer seek a percentage of bonuses. Certainly the court has that discretion. It's written right into the sanctions. So even if income is imputed, the court has statutory factors it's got to look at and can deviate up. And I point out that the statutory factors, again, as we've argued ad nauseum throughout these cases, those are minimums. Those are minimum guidelines. Boys have minimum guidelines, and the court clearly has that discretion under the new law and old law to deviate up or deviate down depending on the needs of the parties. And here, the standard of living that the children enjoy during the course of the marriage, that's something that is very huge as the court sees it. You see it, of course, really. The court relied upon it. In regards to imputing the income, it's argued that it would be $5,800 per month because she worked with Quincy Medical Group some 15 years ago at the rate of $5,800 per month, and because it's on an application. Well, of course, one of those applications, a standard application, what's the last employment you held? What was that income? Did you fill it out? That doesn't mean you're going to make that. That's just an application for one. My opinion is not a basis to impute income. It's argued that the child support is not used to support the families or the children, but to support the entire family. Again, we go back. One of the statutory factors and case law factors is the standard of living the children would have enjoyed had the marriage not resolved. And when I was a young Greenhorn attorney, I made the mistake of asking the judge, well, judge, if we're going to pay that much in support, we want to see where that money's going on a monthly basis. We want receipts. We want this. I filed motions with the court, and I got knocked out for so many times by filing that motion. They learned the hard way sometimes. And every time I filed that motion, no matter what judge I was in front of, told me it doesn't matter, Mr. Whittaker, what the person is using that child support for is to support the entire family. If she wants to use it or he wants to use it to pay mortgage, to pay for groceries, it doesn't matter. It's for the support of the household, the children. And obviously the children have the right. The children didn't cause this divorce. Why should they be penalized? No matter what Mr. Kimber, this company, are doing in their life now or what they did, the children shouldn't be penalized. It's their right to that support. As a custodial parent, she has the right to use that money in what she deems appropriate to make those children happy and so they can live a lifestyle that they're accustomed to living. So that would, in your argument, account for the size of the house and the decision to live in a certain school district and the things that go with that. Yeah, and if we look at that, the house that they used to live in was $400,000. This company and the children now live in the house about $253,000. So she is down some, it's obviously. But she's also put the children in the second best, second-ranked school in the state of Illinois. During the marriage, the children, they were in a swimming club, they were in a country club, they were on trips, cruises. My client went to Spain and was a triathlete. They had monies to do what they wanted to do. As my client testified, the children didn't want for anything. The parties didn't want for anything. So how is it fair to the children to just take that lifestyle away from them that they were accustomed to living during the course of the marriage? I guess the question becomes, is an upward deviation necessary to maintain the standard of living that the children had at the time of the marriage? Yes. And Ms. Compton testified to that. As you will recall from her testimony, she indicated that she needed approximately about $5,000 per month to maintain just the standard of living that they're enjoying right now. That's in Bloomington. That's not living back in Quincy where they were living with the $400,000 house, with the pool, in the country club, in the swimming club, and doing all the extra. That was their own minimum, as she testified at a trial that she needed was $5,000 per month just to maintain what they were doing right now. So the answer to that question is yes, the court should have imputed income. Quickly, I'd like to address the standard of review in this case as pointed out in the Pelham brief is abuse of discretion. No reasonable person would agree with this court's decision. No reasonable person. When we look at this case, we need to look at some of the facts of the case. When we're looking at 2018, in the parties' situations financially, Knightline had a monthly income of $280 per month. Dr. Kinberg had an income of $551,223. Quite a disparity. In 2017, Dr. Kinberg had $383,000 in income. In 2016, $342,000. The court added these three years and came up with a calculation that Dr. Kinberg's average salary was $409,511 since 2016. As we indicated in our brief, he's at 1%. That's what he is. He's guaranteed $300,000 per year, plus bonuses he can share with his medical group. Knightline was a stay-at-home mother. It's argued she's not a stay-at-home mother now, which is not true. She is still there. She works from home. There may be a few days per month she has to go on-site where they do the testing of people, where they do their measurements, and so forth. Then she comes back home and puts all that into the computer. Any work she does is downloading information onto the computer at her home. She is still a stay-at-home mother. This job allows her to be both a stay-at-home mother plus trying to start a business that she proceeds in the recent future will be very lucrative. She's one of the worst in the industry, so only good things can come from here. I have a question about the college fund. Okay. While it may be admirable for the mother to think, I'd like for my daughter to graduate without any debt and still have this nest egg, why is it unreasonable to use the dollars that the family apparently decided to set aside for educational purposes to assist her daughter so that she still graduates without debt, but there may not be as much left in that fund, and I don't know what the conditions are for what happens to that money when she finishes school, or she may pursue a graduate degree. I don't know. Is that a reasonable thought? Certainly it's not that it's a reasonable thought. My client testified that the reason that she was not using that fund at this point was because by the calculations, if she used it now... It would run out. She'd run out before she's out of college, so she's trying to hold that money to try to help her daughter get through college. That was her testimony. It's Ms. Company's position that certainly the court did not use its discretion in this case The court, as you've seen, has a very detailed, rationalized, written opinion which is required under the statute that the court is going to mediate from the statutory guidelines. The court has set forth the factors looking at the statute, has set forth what the court itself calculated would be the appropriate amount if the guideline were followed. The court also set forth the reasons why the court was not following the guidelines in her particular order. So it is our position that the court did not use her discretion, certainly in regards to retroactivity. Again, that's totally within the discretion of the court. The court made a finding that there would be a substantial hardship incurred upon the children. Because if we have a situation where the court makes that retroactive, then Ms. Company would owe Mr. Kimber $70,000 to pay back. She had saved up, through loan payments and child support, approximately $30,000 in her accounts. It's going to deplete those accounts. What is she going to do? Sell her house? Sell her car? To pay back Mr. Kimber? So the court used its discretion and found that that would not be in the best interest of the children and would be a hardship upon the children and not awarding a retroactive reduction. So again, the court used its discretion, which it has. And it's our position that certainly any reasonable person could understand and agree with this decision. If you look at the facts, and if you look at the income, if you look at the history of this marriage, and look at the lifestyle of these children who are accustomed to be living for some time. Thank you. We are not asking anything other than the court following the statute. Mr. Leward began his presentation today indicating that she didn't know what the law was going to be. Well, it makes no difference. We are dealing with what the law is today. Section 505A.1.5 addresses the issue of child support and says that it is presumed to be spent directly on the children. In this case, that didn't happen. Ms. Kompany, since the party's dissolution, used the child support to not only support the four children, three children, two children, but also supported herself, her now husband, his two children when they visited her, and to assist this failing business that she was attempting to operate. So whether or not she knew at that time that the statute was going to change, that has no bearing on the situation that we're in right now. If the legislature wanted to consider that, they could have considered that back then and made it that there was going to be this change, but if there's any change that affects higher orders, that won't come into effect. That's not what the legislature did. It specifically said that any modification of child support is based upon the new statute. So what we are asking the court to follow the law and set the child support based upon the statute. 505A.3.2 addresses the issue of the computed income. If we review that statute, this is a classic case that there has to be income imputed to her. 505A.3.3 states that there is rebuttable presumption to follow the guidelines. The court cannot, the tropper cannot avoid following the law merely because the court thinks, well, maybe it's not fair. The court has the obligation to follow the law and we cannot believe that the court did that in this situation. Mr. Woodworth also addresses that she says that she needs $5,000 a month to support the children. Now, again, I think we're going back to free children, but she has not supported the children from her earnings since the dissolution was granted. There has been no income that she has. The law is that each parent has an obligation to support the children. If she says she needs $5,000, then she also needs to contribute to the support of these children. It's not funny. Dr. Kimball. Your points are well taken, but I want to go back to that. Maintenance. All things being equal, if the facts were as they were during the divorce, at the time of the divorce, would an 18- to 20-year marriage to a physician with this kind of income entitle her to maintenance? Would she have been likely to receive maintenance if she sought it? I would fully agree, yes. I agree that you have to anticipate the unknown, I guess. But would an experienced trial judge or not an experienced trial judge, but a trial judge be able to factor that in in a sense of equity to deciding whether or not I can deviate upward? Could it be? I understand it's not in the statute, and the legislature probably wasn't anticipating that being an issue. Not very many people in your opponent's position would have thought that a wife in this situation, or a spouse in this situation, wouldn't get maintenance, wouldn't ask for it. Can I take that into account if I'm a trial judge? No, in my opinion, you cannot. You cannot. I think, with two families, she voluntarily agreed to not accept maintenance. True. She benefited by being able to get married. Knowing that if she wants to get married and miscarries, she's going to lose her maintenance. So that may have been her factor, though it's irrelevant to you. And back then, she would have had to pay the taxes on the maintenance. And it could have been deductible by doctors. So there's a lot of factors here that were in consideration back there, and that may not be relevant now. But that's something we have to live with. We have a new statute. We can't speculate what we should do. And it's my recollection that there may be something going up in the Supreme Court about this issue. I'm not sure. I think there are some other appellate districts that are saying, what do you do? But right now, we have what we have, and that's what we have to deal with. I think the three issues here, I've never seen a case like that. I think the three issues here would be not including the income and going up in the situation with no rule-supporting evidence to do that, other than she says, I need $5,000. There's nothing there. She has no bills, no nothing. We don't know what the extra-curricular activities are. We have no idea. We don't know what she pays for those. So, again, I think this is a case that we need to closely look at. I think if we don't do something, we'll be sending a bad message. Thank you, counsel. We'll take this matter under advisory.